Thank you, Your Honor. May it please the Court, Mark Kasabian for appellant Maureen Chan Ridley. If permitted, I'd like to reserve three minutes for my rebuttal. Our argument is obviously that Kwan is retroactive. It applies to Ms. Chan Ridley's case. In that respect, how is Kwan inconsistent with Padilla? Kwan is not inconsistent with Padilla. Padilla... Kwan restricts itself to affirmative misadvice regarding immigration. What do we make of the fact that Padilla talked about the Sixth Amendment and did a Sixth Amendment analysis and Kwan did not? Well, the Sixth Amendment analysis is implied by Kwan, certainly, where ineffective assistance of counsel could render a plea to a criminal account retroactive. Kwan did not address specifically the Sixth Amendment, but rather, I think implicitly, whether ineffective assistance of counsel would render a plea involuntary. Counsel, do we have to reach a retroactivity analysis? I don't believe so, Your Honor. I addressed it in my papers because that was what was addressed in the court below. Frankly, Your Honor, I don't think so because looking at how Kwan is treated in Chaydez, as distinct from other cases in other circuits and other circumstances... The theory how Kwan is treated in Chaydez might suggest then that Chaydez contemplated that Kwan might indeed be retroactive. I'm wondering whether we even have to reach the retroactivity question at all. Here's the basis for my question. In Kwan, Kwan was a quorum nobis case, just like this. That meant that we had to go through the four steps, the last of which was whether a fundamental right was at issue. Kwan pled guilty in 1997, and when we issued our decision in 2005 in Kwan, what we effectively said was that as of 1997, under Strickland, that Kwan's attorney had violated a fundamental duty or a fundamental right. And so Kwan was entitled to relief. So why do we even have to reach a retroactivity question? Doesn't Kwan establish that an affirmative misrepresentation by counsel in the context of a guilty plea is a fundamental right entitling one to quorum nobis relief? Your Honor, I think that that is probably right. I think that we may not need to address to retroactivity. In other words, if this case, if we didn't even have Kwan, we could decide this case consistent with Couto, the Second Circuit case, apparently because that's what we did in Kwan. We just said, yeah, this is a fundamental right. We're going to issue the writ of quorum nobis. I think that's right, Your Honor, because this circuit has consistently treated misadvice regarding pleas as an ineffective assistance to counsel, rendering pleas involuntary. I didn't address it in my papers, but looking back in preparation for oral argument here, I saw at least a case going back to 1986. It didn't involve immigration consequences. It involved gross misadvice and gross bad advice regarding potential penalties, a potential sentence in that case. What do we do about Frye, though, saying that it's an issue of first impression because it's a collateral consequence? It's not a Strickland violation. The Sixth Amendment doesn't reach that far. Because we have to say that it was dictated by our precedents, and Frye seems to go the other way. Well, Frye doesn't go the other way in these circumstances. Frye deals specifically over and over and over again with failure to advise. But didn't Petia say there's no difference? Petia says that there's no distinction between misadvice and failure to advise for purposes of this collateral consequence analysis. In this circuit, there is. In this circuit, there is a distinction because fundamental misadvice regarding an important issue in a criminal case has never been treated under the collateral consequence. But this isn't in a criminal case, right? This was a collateral immigration. There's no pre-Frye case that applies Strickland to an immigration consequence, right? Correct. Not in this. No, there is not. So all of the misrepresentation cases involve criminal issues, issues that were pertinent to the criminal case. That's right, Your Honor. But when this court addressed Kwan, it did not address it as a collateral matter. It treated it as Chaidez acknowledges, simply as an application of Strickland to the situation at hand, which was a fundamental misadvice regarding a crucial matter important to a client. So was Kwan dictated by our precedent? I mean, isn't that what we have to say for a Teague analysis, assuming we're doing that? Assuming you're doing a Teague analysis, yes. I believe it goes back to the IEA v. Sun case, 800 F. 2nd 861. That's a 1986 case, which again does not address collateral versus direct consequences, but holds that a material misrepresentation regarding an important fact, in that case, grossly wrong, grossly incorrect advice regarding the possible sentences. It is a violation of Strickland. Further, as we've cited in many, many cases around the country, fundamental misadvice regarding immigration has consistently been held, whether held or noted in dicta, as implicating Strickland as well. The Supreme Court rejected that, though, right, in Chaidez? That was the dissent's argument. Well, the Supreme Court in Chaidez drew a distinction between those circuits which did not have, had not announced the Kwan rule and those circuits that had. For the circuits that had not announced the Frey rule, Chaidez simply stated that Padilla, which covers a broader range than Kwan, was not retroactive. The implication, the certain implication, because it's not an issue, it was not an issue in Chaidez, our particular issue was not, Chaidez did recognize that for those circuits that had announced the rule that we have here in Kwan, that that's a different issue. And that they would not address retroactivity regarding failure to advise for those circuits, like this one, that had already announced Kwan. Now, I see, Your Honor, I'm already eight minutes in. Yeah. So, if the Court has any particular questions, I defer to my colleague, Mr. Andre. Okay. Good morning. Sean Claude Andre on behalf of the United States. I'm sorry, how do you pronounce your last name? Andre. Andre, okay. It may be a little bit unorthodox, but I'd actually like to start with the arguments at the back of our answering brief in this case. And I think it's actually the easiest way for this Court to resolve this particular case. And that also goes to Judge Akuta's questions. Padilla took the Kwan rule and, I guess, the anti-Frey rule and unified them and said both affirmative misadvice and failure to advise are ineffective assistance of counsel under the Sixth Amendment. At the same time, Chaydez, of course, was asked or Chaydez presented the question whether Padilla is retroactive. And Chaydez said no. And we believe that that is the simplest way for this Court to resolve this case insofar as… Why does it even matter? Our Court has already said in a case involving Coram Nobis that an affirmative misrepresentation, which is outside the Padilla rule, that an affirmative misrepresentation by counsel with respect to an immigration question is the violation of a fundamental right and renders a guilty plea null. And that just seems to be four square here. And I don't even know why retroactivity even has to come into this. There was nothing retroactive in Kwan for us to rely on. We weren't relying on any settled rule. There's no settled cases. We said this is an obvious error. Why aren't we bound by that? I don't think you're bound by it given that Kwan came down in 2005 and the defendant's guilty plea in this case was in 2000. Right, but Kwan's guilty plea was in 1997. And our Court said in 2005, in 1997, this was a fundamental error for which we can grant Coram Nobis relief. So why doesn't that rule bind us here? I'm not familiar with any cases applying, I guess avoiding a Teague analysis that way. I think the central question is when does this Court announce the rule, not to what date did the Court's announcement apply? And so if you do look at the dates in this case, you have the defendant's perjury in 1993, her guilty plea in 2000. In 2002, you have Amador-Leal, which says that immigration consequences are collateral consequences. In 2003, you have Frey, which says failure to advise. All of that's running the government's way. Then Kwan comes in and seems to be running headlong into the government. So the Kwan clearly is your problem. Everything else before that sort of seems irrelevant. I agree, Judge Bybee. But, again, the issue is that Kwan announced its rule in 2005, which was well after the defendant's plea. So if the defendant had pleaded in half… It was well after Frey's plea. That's my whole point. This was also a Coram Nobis proceeding. Sometimes collateral consequence proceedings come up in a different context. But this was a Coram Nobis. It's square on point with this case. If I could just think about Teague for a moment. So Teague says when the Supreme Court decides a rule of criminal procedure, I guess they apply it to the people, the parties in front of them. And then the question is for us, the lower courts, to determine whether that new Supreme Court rule, which was applied to the people in front of them, is applicable to another case in front of us. So the timing of the Supreme Court's rule in their new rule on those parties isn't really relevant to our application of Teague. Is that right? Am I understanding that right? I think it's… So Crawford comes down, and we have a new confrontation clause rule, which was applied in that case. But then Danforth tells us, no, we can't apply Crawford when we're analyzing confrontation clause claims that arise in habeas. So how would that apply here then? So we apply Quan to that case, but I'm not sure what that tells us about applying Quan to other cases that arise before Quan was decided. Right. I'm trying to track the question, Judge Apuda. I mean, the central obligation when the Supreme Court announces a rule, be it Crawford or be it Padilla, is for the defendants to then get in line and argue to the lower courts that that rule announced by the Supreme Court in that other case applies retroactively. And, of course, this is Cormobus, so we don't have a statute of limitations issue. But in the statute of limitations context, that's where you see defendants being barred because they have to get in line the minute the Supreme Court announces the rule, and they have a year to do so. So with respect to timing, the analysis that you would apply to the Supreme Court announces the rule is the same that this court would apply to its own precedent. And, of course, that's what the Cuoto court did in the Second Circuit. It said, you know, we have this rule, and then Kovacs said, okay, yes, you know, it applies retroactively. Here the problem, again, is that the defendant pleaded guilty in 2000. There was no law in this circuit, and frankly, not even in the Second Circuit because Cuoto had been decided in 2002. There was no law at the time the defendant pleaded guilty that imposed an obligation on counsel to give accurate advice about immigration consequences. So Judge Baiby's point, if I'm understanding him correctly, is that in Quan we applied this rule to the party before us who had a guilty plea from earlier. So how does that affect our analysis now as to the applicability of Quan to this new claim? Ms. Chan. I think Quan would apply to any defendant who pleaded guilty after Quan was announced, but not to any defendant who pleaded guilty before him. That suggests that Ms. Chan is being punished for having the temerity to bring her case after Quan. If she brought the case before Quan, she brought it before the Quan panel. If the case had been argued simultaneously with the Quan case, then she would have gotten the benefit of the rule. But because she has misfortune coming after Quan, she loses the rule. Yes. I understand why that happens in Padilla because Padilla is regarded as a sea change in the law. But this one, my whole point about Quan is that it arose in the context of a quorum nobis claim in which the fourth element is you must prove fundamental error. And our court held that a misrepresentation, not a failure to advise, but a misrepresentation was a fundamental error. I don't understand why Ms. Chan doesn't get the benefit of that rule. Again, it boils down to timing in our view. So if she had brought it a day before Quan, a court had heard Quan, she'd be okay? I mean, yes. I mean, well, if she brought her petition, yes, then she would be okay. If the panel had come down that way. The same way. I mean, and I don't want to criticize Quan because I think everybody, everybody in the world agrees that Quan is correct now. But from 2005 until Padilla came down, the government's view was that Quan was wrong. I mean, Quan came out of nowhere. It sided with the Second Circuit. It seemingly contradicted— Which would seem to suggest then that Quan was wrong inasmuch as it said that this was fundamental error. At the time, yes. Then, not now. Again, now we agree with Quan. Right. But aren't we stuck with that? I mean, I may disagree with Quan. I may disagree that this was fundamental error in 2005 looking retrospectively to 1997 when Quan pled guilty. But I'm stuck with Quan for better or for worse. So aren't I stuck with the idea that this is fundamental error that can be corrected on quorum nobis? Not if the court parses the timing the way the government has. Well, so the fundamental error is ineffective assistance of counsel. So what we're really looking at is was it ineffective for the counsel, Mrs. Jan's counsel, to give her misadvice about the immigration consequences? Right. And so we would have to say that the attorney was—before Quan was ever decided, the attorney fell below the standard at that time. Right, that he had this obligation at that time. And, of course, in 2000, he didn't because neither the Second Circuit nor this court had imposed that obligation on counsel. And, in fact, this court's case— He didn't have an obligation to answer the question correctly when she asked him the question? That's the collateral consequence versus direct consequence distinction that Amador Leal, Frey, and a number of other cases around the country have all recognized. Now, of course, again, Padilla changed that. Frey was about an affirmative duty to come forward with the consequences. This is a different case. This is what happens when she asks the question. What happens when the woman who's being charged with cocaine trafficking says, is there any chance my kids will be taken away from me by Child Protective Services if I plead guilty? Right. And the lawyer says, no. Right. No chance. And under this court's settled case law, there are a number of collateral consequences where attorneys, frankly, are free to give wrong advice. Can I get a gun if I plead guilty? Yes, even though, of course, you can't because now you're a felon. Can I vote? Yes. Even though you can't because now you're a felon. So that's not an effective assistance of counsel. No, because those matters are all considered collateral consequences and until— Even though you would not have pled guilty but for the bad advice that you got. Correct. And that's the distinction. That's why Padilla was, although not a watershed rule, a sea change in the law in that it took immigration consequences out of that bucket of collateral consequences and said— But Padilla's a whole different rule. Padilla says the attorney has to come forward affirmatively and give the advice. It's not in response to questions. It's not affirmative misrepresentation. It's a duty to represent. It's a completely different responsibility. And it's a far more aggressive interpretation of the Sixth Amendment than the rule that we adopted in Kwan that the Second Circuit adopted in Cowoodo. I see that moment of my time. If I could respond briefly. Again, we think Padilla and Chaidez addressed that. In particular, in pages 1110 and 1111 of Chaidez, this report said it was Padilla that first rejected that categorical approach and so made the Strickland test operative when a criminal lawyer gives or fails to give advice about immigration consequences. And on the next page, 1111, our first order of business in Padilla was thus to consider whether the widely accepted distinction between direct and collateral consequences categorically foreclosed Padilla's claim, whatever the level of his attorney's performance. Counsel, why should we conclude that Chaidez controls Kwan? Chaidez made clear that Padilla was not retroactive because of Padilla's special analysis as to whether the Sixth Amendment even applied to advice regarding deportation. There is no analogous discussion in Kwan.  The connection, Judge Nelson, is that Padilla basically took Cowoodo and Kwan and adopted them as half of the Padilla court's holding. And that became— That was easy. Once the Padilla court said that fails to give advice is a violation of Strickland, then obviously giving—affirmatively giving bad advice was easily within that rule. But both of those rules are embodied in Padilla. And then the Supreme Court has asked in Chaidez whether Padilla is retroactive, and the Supreme Court said no. And that's, again, why I start off— But Padilla is a much, much broader rule than we adopted in Kwan. Yes. Because it overrules the rule that we adopted in Frye. Yes. But, again, because Chaidez was asked whether—or Chaidez asked the question whether Padilla is retroactive. And since Padilla subsumed or adopted this court's decision in Kwan, then the Chaidez analysis of retroactivity should control. If the panelists have no further questions, I'm happy to— Okay. Thank you, Mr. Andre. Thank you. Mr. Kostovian, you have a couple of minutes. Thank you, Your Honor. I'd like to address a little bit of the blurring of the line between—that the government in its papers and its argument seems to be doing between the law in this circuit— not talking about Padilla, not talking about Nationwide, but the law in this circuit— distinguishing failure to advise and affirmative misadvice. Amador-Leal. That was the collateral consequence—they applied the collateral consequences rule to whether a defendant needed to be warned about the consequences of taking a plea, the plea colloquy. Same with Frenchman. Same with, I believe, Sanchez. All of those dealt with failure to advise. I believe all of those dealt with plea colloquies, but they did not deal with affirmative misadvice, which this Court has treated, near as I can tell for the last 30 years, as separate and apart from the collateral consequences rule. So— Is there a case on point? No. I believe that the case that I cited to you earlier, IEA v. Sun, that's 800 F. 2nd— Is there a misadvice case looking at a collateral consequence? No, Your Honor. It did not. I believe that's an implication that can be drawn from that rule. But, again, the implication that I think can be drawn from Quan and the other cases that we're discussing is that they didn't even address collateral consequences. This Court didn't treat misadvice as even being—as the collateral consequences rule, even being part and parcel of a case dealing with misadvice in a plea context regarding a crucial and important matter that a defendant would need to take into account, would be expected to ask a lawyer about, and that a lawyer would be expected to at least, if he's not an expert on it, do what we all do, which is call up an immigration expert and make the necessary inquiries. Your Honor, I see I'm over time. If there are any particular questions, I'd be happy to answer them. I don't think there are other questions. Thank you, Mr. Kastabi. Thank you, Your Honor. Mr. Kastabi and Mr. Ong, may we thank you both for a spirited argument for addressing the Court's questions.
judges: Nelson, Bybee, Ikuta